## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| CRUMBL LLC; CRUMBL IP, LLC; and CRUMBL FRANCHISING, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>DIRTY DOUGH LLC; and BRADLEY MAXWELL,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Case No. 2:22-CV-318-HCN-CMR<br><br>Howard C. Nielson, Jr.<br>United States District Judge |

Crumbl (Crumbl LLC, Crumbl IP, LLC, and Crumbl Franchising, LLC) sues Dirty Dough LLC and Bradley Maxwell, asserting various state and federal claims, including claims for misappropriation of trade secrets under the federal Defend Trade Secrets Act and the Utah Uniform Trade Secrets Act and a claim for breach of contract against Bradley Maxwell. *See* Dkt. Nos. 2 & 23. Crumbl moves for a preliminary injunction. *See* Dkt. Nos. 37 & 42. Following an evidentiary hearing, the parties stipulated to an order that mooted some of Crumbl's requested relief. *See* Dkt. No. 124. The court denies Crumbl's motion.[1]

## I.

Crumbl and Dirty Dough are competitors in the gourmet cookie market. Both companies run retail cookie stores, and both companies have expanded by selling franchises in multiple States. But the two companies' business models differ in significant respects. Dirty Dough uses a centralized facility to make all of its dough, which is then shipped frozen to franchise stores for baking. By contrast, the dough is mixed and baked on site at each Crumbl franchise store. In

---

[1] On May 30, 2023, Dirty Dough filed a motion to strike many of the exhibits cited in Crumbl's post-hearing brief. *See* Dkt. No. 141. Because the court denies Crumbl's motion for a preliminary injunction, it denies as moot the motion to strike Crumbl's exhibits.

addition, Crumbl's signature cookies usually each contain only one type of dough and have a thick layer of frosting, while Dirty Dough's cookies are generally made with layers of different types of dough and no frosting.

Crumbl opened its first store in Logan, Utah, in 2017, and now has hundreds of franchise stores across the country. *See* Dkt. No. 104 ¶ 2. In March 2019, Bennett Maxwell approached Crumbl about the possibility of acquiring a Crumbl franchise. *See* Dkt. No. 104 ¶ 7. On March 29, 2019, Crumbl informed Bennett Maxwell that it had "decided not to move forward with [him] as a seller at this time." Dkt. No. 38-4 at 1.

Meanwhile, Crumbl hired Bennett Maxwell's brother, Bradley Maxwell, as a process engineer, first as a contractor for a week beginning on February 28, 2019, and then as an employee in late March 2019. *See* Dkt. Nos. 104 ¶ 8 & 135-1 at 78:10–16. On March 29, 2019, Bradley Maxwell signed two agreements titled "EMPLOYEE CONFIDENTIALITY AND NON-COMPETITION AGREEMENT" and "EMPLOYEE CONFIDENTIAL RECIPE AGREEMENT." Dkt. Nos. 38-5 & 38-6. The agreements were labeled at the top of the documents as "EXHIBIT 'A-4' TO THE FRANCHISE AGREEMENT" and "EXHIBIT 'A-6' TO THE FRANCHISE AGREEMENT," respectively. Dkt. Nos. 38-5 & 38-6. Both agreements list "Crumbl Corporate" and Bradley Maxwell as the parties to the agreement. Dkt. Nos. 38-5 & 38-6. In these agreements, Crumbl Corporate is identified as the "Franchisee" and Bradley Maxwell is identified as the "Employee." Dkt. Nos. 38-5 & 38-6.

The first sentence of the second numbered paragraph of the Employee Confidentiality and Non-Competition Agreement provides:

> <u>Non-Disclosure</u>. Except as may be required in the performance of duties for Franchisee, Employee will not, during the course of his or her employment and thereafter, directly or indirectly use, or disclose to any third party, or authorize any third party to use, any information relating to the business or interest of

Franchisee or Franchisor, which he or she knows or reasonably should know is regarded as confidential and valuable to the Franchisee or Franchisor, including recipes, mixes, sauces, techniques, food preparation, store guide, teaching methods, standards, merchandising, marketing, sale of products and services, specifications, pricing, accounting systems, procedures, sales, income, specifications, products, manuals, business plans, customer lists, that relate to Franchisee's business, the Crumbl™ System and franchise products, customers, suppliers and marketing plans.

And on the second page, the agreement states:

Return of Materials. At the termination of employment, Employee agrees to deliver to Franchisee (and will not keep in his or her possession or deliver to anyone else whether in hard or electronic soft copy) the Crumbl™ Manuals and any and all records, data, designs, photographs, mixes, sauces, food preparation, recipes, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any such items belonging to Franchisor or Franchisee, or either of their successors or assigns relating to the Crumbl™ business and the System.

The Employee Confidential Recipe Agreement imposes similar non-disclosure obligations on employees, including the duty "not to copy, transmit, recreate or otherwise reproduce the Recipes at any time." Dkt. No. 38-6 at 2-3. This agreement also contained a provision requiring the return of materials upon termination of employment. *See id.* at 3.

During his employment at Crumbl, Bradley Maxwell had access to Crumbl proprietary information, including recipes. *See* Dkt. No. 104 ¶ 14. Crumbl's cookie recipes, many of which are around ten-pages in length, include specific ingredient portions, photographs, links to instructional videos, steps for mixing and baking cookies, baking time, ball size, as well as tips for getting the best results and mistakes to avoid. *See* Dkt. No. 104 ¶ 4(a)–(b). Each Crumbl cookie recipe also instructs the company's bakers to add the contents of a "white packet," which includes additional ingredients. Dkt. No. 135-1 at 95:17–21, 96:13–22. But the recipes do not disclose the ingredients contained in the "white packet." *Id.* at 96:13–22, 219:25–220:11. Crumbl had taken efforts to protect the proprietary information to which Bradley Maxwell had access from public dissemination, including requiring employees and franchisees to sign non-

disclosure agreements and storing the proprietary information on a password-protected server accessible only by employees or franchisees who had signed confidentiality agreements. *See* Dkt. No. 104 ¶ 6.

Less than two months after Crumbl told Bennett Maxwell that he would not receive a Crumbl franchise and Bradley Maxwell joined the company as a process engineer, the brothers invested in Dirty Dough, a gourmet cookie company located in Arizona. By May 19, 2019, Bennett and Bradley Maxwell each held a fifteen-percent equity stake in Dirty Dough and (at least according to the company's articles of organization) were members and managers of the company. *See* Dkt. No. 38-7. In January 2021, Bennett Maxwell bought out the remaining interests in Dirty Dough. *See* Dkt. No. 38-1.

Meanwhile, Crumbl terminated Bradley Maxwell's employment on June 1, 2019. *See* Dkt. No. 135-1 at 82:14–17. During the last week of his employment, Bradley Maxwell downloaded 66 Crumbl recipes and other Crumbl information from Crumbl's internal password protected server onto his personal cloud drive. *See* Dkt. No. 135-1 at 82:10–19, 114:1–7. In addition to the recipes, the downloaded documents included Crumbl sales statistics; information about process improvement and recipe experiments; Crumbl's "cookie calendar"—its projected rotating cookie menu; individual store specifications, schematics, and blueprints; and Crumbl's "Build Out Guides," which provide franchisees directions and information for building and running a Crumbl store. Dkt. Nos. 104 ¶ 4(c) & 135-1 at 91:15–92:18, 114:13–17, 127:11–16, 144:22–25.

Although Bradley Maxwell returned his company laptop, he did not delete or return any of the Crumbl information he had downloaded to his personal cloud drive or home desktop computer. *See* Dkt. No. 135-1 at 113:1–12. Instead, in September 2021, Bradley Maxwell

4

uploaded the 66 Crumbl recipes and other Crumbl documents he had downloaded during his last week at Crumbl to Dirty Dough's Google Drive. *See* Dkt. No.135-1 at 91:15–92:18, 114:13–17, 144:22–25. Taken together, these files comprised over 640 MB of Crumbl information. *See* Dkt. No. 104 ¶ 22. Although he denies "reading" the Crumbl information his brother uploaded to the Dirty Dough Google Drive, Bennett Maxwell concedes that he "reviewed those documents at some point to see what they were." Dkt. Nos. 135-2 at 411:11–2 & 100-1 at 3 ¶ 7.

Meanwhile, in July 2021, Bradley Maxwell met with Tracy Warner, a then high-level Dirty Dough employee. *See* Dkt. No. 38-11 & 40 ¶¶ 7–8. Bennet Maxwell arranged this meeting, telling Ms. Warner that the purpose of her meeting with his brother—"the one that you talked to that worked for Crumbl"—was "seeing what exactly is needed" and "logistics of the warehouse, shipping, you know getting the correct boxes, the weight loads, sizing everything correctly, the layout, that sort of thing." Dkt. No. 38-11. Ms. Warner marked her notes from the meeting with the heading "Notes from Crumbl Operations (Brad)." Dkt. Nos. 42-3 & 40 ¶ 8. The notes list items she intended to ask Bradley Maxwell, including "What challenges did you have growing Crumbl that we should anticipate?" and "Do you use separate flours?" Dkt. No. 42-3. The notes also show that Bradley Maxwell and Ms. Warner discussed "efficiency" at Crumbl, "how to ball" cookies, "weigh[ing] cookies," and dough refrigeration. *See id.*

In addition to uploading the information he had taken from Crumbl to Dirty Dough's Google Drive in September 2021 (as already recounted), Bradley Maxwell also shared the same files with Bennett Maxwell, Tracy Warner, and four other Dirty Dough employees via a Google folder titled "Crumbl" on September 27, 2021. *See* Dkt. Nos. 105-18 & 135-1 at 91:15–94:04, 114:13–17. In the cover email, Bradley Maxwell wrote, "[h]ere are my notes/files from Crumbl. The Build Out 2.0 pdf is pretty informative." Dkt. No. 105-18.

Crumbl learned that its information had been disclosed to Dirty Dough after filing this action. After Crumbl filed suit, a public relations battle between the two companies ensued on social media, bringing the lawsuit to the attention of a former Dirty Dough employee who sent a direct message to Crumbl on social media stating that "all of Crumbl's information is on the Dirty Dough Google Drive. Bennet Maxwell obtained it from a brother or a cousin that works for you." Dkt. No. 38-8. This former Dirty Dough employee also told Crumbl that Ms. Warner knew that Dirty Dough kept Crumbl information on a Google Drive. *See* Dkt. No. 42-1 ¶ 20.

Crumbl had initially asserted claims for trade dress infringement, unfair competition, and false designation of origin under the Lanham Act and claims for deceptive trade practices, unfair competition and unfair business practices, and unjust enrichment under Utah law. *See* Dkt. No. 2. But after learning that its information had been disclosed to Dirty Dough, Crumbl amended its complaint to assert claims for misappropriation of trade secrets and a breach of contract claim against Bradley Maxwell. *See* Dkt. No. 23.

In response to Crumbl's expansion of the litigation, Dirty Dough issued a press release, asserting that "Dirty Dough categorically denies stealing any documents from Crumbl." Dkt. No. 38-2 at 2–3. In the comments on Bennett Maxwell's LinkedIn post of the press release, a commenter asked, "The question still though, is does Dirty Dough have now, or have ever had in hand: Crumbl recipes, building schematics, processes, store-level statistics, cookie calendar, training videos, and other proprietary information?" Dkt. No. 38-2 at 3. Bennett Maxwell replied in the thread: "Evan Reyne I'm down for a real convo! And no, Dirty Dough doesn't have any Crumbl trade secrets." Dkt. No. 38-2 at 5.

Crumbl moved for a preliminary injunction on September 16, 2022. *See* Dkt. No. 42. On December 13, 2022, Magistrate Judge Romero entered a stipulated order establishing a forensic

protocol for examination of Bradley Maxwell's personal Google Drive; Dirty Dough's Google

Drive; Dirty Dough's Slack accounts; Dirty Dough's company email accounts; "any and all

computers and electronic data storage devices . . . that are (or were within the last four years) in

the care, custody or control of Dirty Dough or Bradley Maxwell"; and cell phones owned by

Bennett Maxwell, Bradley Maxwell, and three other Dirty Dough employees. *See* Dkt. No. 69 at

2. Scott Polus of Consilio conducted the forensic examination. *See id.* at 1; Dkt. No. 101. The

court then held a two-day evidentiary hearing on Crumbl's motion on April 26 and May 4, 2023,

hearing testimony from Bradley Maxwell, Tyler Peery (a co-founder of Dirty Dough), Scott

Polus, Jason McGowan, and Bennett Maxwell. *See* Dkt. Nos. 115 & 120.

At the conclusion of the evidentiary hearing, the parties stipulated to the entry of an order

requiring Dirty Dough and Bradley Maxwell to (1) return to Crumbl all copies or derivatives of

the "Crumbl Information";[2] (2) deliver to Crumbl any notes, memoranda, summaries, or

---

[2] For the purpose of the stipulated order (and this memorandum decision and order), "Crumbl Information" means:

    (1)    Sixty-six documents labeled as "recipes," which Bradley Maxwell downloaded from an internal Crumbl file storage system on May 26, 2019, while an employee of Crumbl;

    (2)    The document titled "Crumbl Internal Stats.png," which is a screenshot Bradley Maxwell took from an internal Crumbl website dated May 25, 2019;

    (3)    All files contained in the "Process Improvements" folder, which is a folder containing material Bradley Maxwell created or used during his time at Crumbl;

    (4)    All files, including videos, in the "Experiments and measurements" folder, which is a folder containing material Bradley Maxwell had access to during his time at Crumbl;

    (5)    The file titled "Cookie Calendar.pdf," which Bradley Maxwell downloaded from an internal Crumbl file storage system on May 26, 2019, while an employee of Crumbl;

compilations that contain information derived from or incorporating the Crumbl Information; and (3) verify in writing under oath that they have done so and not retained any copies of the Crumbl Information in any form or format. *See* Dkt. No. 124 at 1.

The stipulated forensic examination and the stipulated order mooted much of the relief Crumbl had initially requested in its motion for a preliminary injunction. While Crumbl continues to seek a preliminary injunction, it is the court's understanding that Crumbl's requested relief is now limited to an order compelling Dirty Dough to (1) "issue a corrective public statement conceding improper acquisition" of certain Crumbl information, and (2) "delay opening of further franchisee stores [pending] a determination that Dirty Dough will not use any Crumbl information to support franchisee stores." Dkt. No. 42 at 2.

## II.

"A preliminary injunction is an extraordinary remedy, the exception rather than the rule." *Aposhian v. Barr*, 958 F.3d 969, 978 (10th Cir. 2020) (cleaned up). To obtain a preliminary injunction, Crumbl must show "(1) a substantial likelihood of success on the merits; (2) irreparable harm to [Crumbl] if the injunction is denied; (3) the threatened injury outweighs the harms that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Id.* (cleaned up). "[B]ecause a preliminary injunction is an extraordinary remedy, the movant's right to relief must be clear and unequivocal." *Id.* (cleaned up). For the reasons explained below, the court finds that Crumbl has failed to demonstrate a clear and unequivocal right to the injunctive relief it seeks.

---

(6)     Two Crumbl build-out guides, titled "Crumbl – Build Out 1.0.pdf" and "Crumbl – Build Out 2.0.pdf," which Bradley Maxwell received while an employee of Crumbl; and

(7)     The spreadsheet titled "Store Notes," which Bradley Maxwell had access to during his time at Crumbl.

## A.

In determining whether a preliminary injunction is warranted, the threshold question is whether the plaintiff has shown "a substantial likelihood of success on the merits." *Aposhian*, 958 F.3d at 978. Although the court ultimately need not need to decide this issue, it appears that Crumbl probably has shown a likelihood of success on the merits of its claims for misappropriation of trade secrets.

Under both the federal Defend Trade Secrets Act and the Utah Uniform Trade Secrets Act, a court "may" grant an injunction to prevent "actual or threatened misappropriation" of a trade secret. 18 U.S.C. § 1836(b)(3)(A)(i); Utah Code § 13-24-3(1). The federal statute defines "trade secret" to include:

> all forms and types of financial, business . . . technical, [or] economic . . . information, including patterns, plans, compilations, . . . designs, . . . methods, techniques, processes, [and] procedures . . . whether or how stored, compiled, or memorialized physically, electronically, graphically, . . . or in writing if—(A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1893(3). The Utah statute's definition of a trade secret is substantially the same. *See* Utah Code § 13-24-2(4).[3]

Under both statutes, "misappropriation" means, in relevant part:

---

[3] Under the state statute, "trade secret" means

> information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Utah Code § 13-24-2(4).

(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) disclosure or use of a trade secret of another without express or implied consent by a person who—

 (i) used improper means to acquire knowledge of the trade secret; [or]

 (ii) at the time of the disclosure or use, knew or had reason to know that the knowledge of the trade secret was—

  . . .

  (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

  (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret.

18 U.S.C. § 1839(5); *see* Utah Code § 13-24-2(2) (using the same definition with only minor grammatical differences). Both statutes define "improper means" to include "breach of a duty to maintain secrecy." 18 U.S.C. § 1839(6); Utah Code § 13-24-2(1).

The court has little doubt that at least some of the Crumbl information at issue in this case meets the definition of a trade secret. To be sure, Crumbl's recipes do not specify the ingredients contained in the "white packet." But based on the testimony at the evidentiary hearing, the court simply cannot credit Dirty Dough's claim that all of the information that *is* contained in these recipes—including specific ingredients and portions; photographs and instructional videos; detailed steps for mixing and baking cookies; baking time; ball size; and tips for getting the best results and mistakes to avoid—is generally known or readily ascertainable. And it strains credibility to think that simply because Crumbl's recipes do not specify the ingredients contained in the "white packet," the remaining detailed information in these recipes derives no economic value from not being generally known or readily ascertainable. Further, Crumbl has taken

reasonable efforts to protect this information, including requiring employees and franchisees to sign non-disclosure agreements and storing the recipes on a password-protected server.

The court also has very little doubt that Bradley Maxwell acted unlawfully—and no doubt that he acted unethically—when he kept the Crumbl information after his employment was terminated and when he disclosed that information to Dirty Dough. Bradley Maxwell signed two confidentiality agreements with Crumbl that obligated him not to disclose the types of information he shared with Dirty Dough. And the arguments he offers in his attempts to excuse or justify his conduct are contrived and utterly unconvincing.

Bradley Maxwell first contends that he was not required to return the information that he downloaded to his personal cloud account and computer from Crumbl's servers because no one asked him to do so. *See* Dkt. No. 135-1 at 82:19–22, 114:8–12. But there is no reason why anyone at Crumbl would have made such a request, because the company did not know that Bradley Maxwell had downloaded the Crumbl information to his personal cloud account and computer. To be sure, Bradley Maxwell claims that Crumbl had authorized him to download the Crumbl information to his cloud account and personal computer and therefore should have known that he had done so. But all he offers to support this claim is his testimony that Mr. McGowan gave him permission *on one occasion* to use his personal computer to work *on one specific presentation* while he was a contractor with Crumbl. *See* Dkt. No. 135-1 at 75:17–78:1. Bradley Maxwell offers no evidence that he even had a legitimate work-related reason to access *all* of the Crumbl information he eventually gave to Dirty Dough, let alone that he ever had permission to download *any* of this information to his personal computer and cloud account.

Furthermore, Bradley Maxwell had signed two confidentiality agreements that obligated him "[a]t the termination of employment . . . to deliver" to his employer "any and all [Crumbl]

records, data, designs, photographs, mixes, sauces, food preparation, recipes, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any such items." Dkt. No. 38-5 ¶ 6; *see also* Dkt. No. 38-6 ¶ 6 (substantively similar language related specifically to Crumbl recipes). Further, both agreements bound Bradley Maxwell "not keep in his or her possession or deliver to anyone else whether in hard or electronic soft copy" any of the types of confidential information listed in the agreements. Dkt. Nos. 38-5 ¶ 6 & 38-6 ¶ 6. Bradley Maxwell was thus contractually obligated to return the Crumbl information he had downloaded to his personal computer and Cloud account when his employment at Crumbl ended whether or not Crumbl asked him to do so.

Bradley Maxwell's shifting arguments that the confidentiality agreements did not bind him are wholly unpersuasive. Bradley Maxwell initially argued that even though he signed the confidentiality agreements, they did not bind him because Crumbl did not countersign them. *See* Dkt. No. 135-1 at 131:5–20. But even if the agreements are subject to the statute of frauds, "it is well settled in most jurisdictions" that "the memorandum need be signed only by the party in the position of the defendant." 10 *Williston on Contracts* § 29:38 (4th ed. May 2023 update). Here that is Bradley Maxwell, who indisputably signed the agreements. And Bradley Maxwell has not cited, and the court has not found, any authority suggesting that Utah deviates from this general rule.

Then, just days before the evidentiary hearing, Bradley Maxwell's attorney noticed that the headings on the two agreements read "EXHIBIT 'A-4' TO THE FRANCHISE AGREEMENT" and "EXHIBIT 'A-4' TO THE FRANCHISE AGREEMENT," respectively. Dkt. Nos. 38-5 & 38-6. Because the agreements were made using forms that appear intended to

be used by franchisees, the attorney concluded that Bradley Maxwell must have signed them when he applied for a Crumbl franchise. *See* Dkt. No. 135-1 at 131:21–132:17. And because Crumbl did not accept the application, Bradley Maxwell now argues that the agreements are not binding.

The court, however, credits the testimony of Crumbl CEO Jason McGowen that although the agreements were originally drafted to be used by Crumbl franchisees to enter into confidentiality agreements with franchise employees, "early on," Crumbl sometimes repurposed documents that its attorneys had drafted for its franchisees to enter into agreements with Crumbl's corporate employees rather than having its attorneys draft new documents. Dkt. No. 135-2 at 260:8–262:3, 272:18–19. This explanation is supported by the agreements here, which Bradley Maxwell signed not as the "franchisee"—as he presumably would have done had he signed them as part of a franchise application—but as the "employee," and which expressly define the "franchisee" as "Crumbl corporate." Dkt. Nos. 38-5 & 38-6. It is also corroborated by examples proffered by Crumbl at the evidentiary hearing of other instances when it used forms originally prepared for its franchisees to enter into agreements with other corporate employees. *See* Dkt. No. 135-2 at 305:6–7: 313:21–318:12.

Perhaps it is a somewhat closer question whether *Bennett* Maxwell (and, through him, Dirty Dough) acted unlawfully. The evidence certainly suggests, however, that Bennett Maxwell knew or had reason to know that the Crumbl information uploaded to Dirty Dough's Google Drive or shared directly with Dirty Dough employees "was acquired through improper means"— which, again, include "breach of a duty to maintain secrecy"—or "from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret." 18 U.S.C. § 1839(5)–(6); *see also* Utah Code § 13-24-2(1)–(2). To be

13

sure, Bennett Maxwell testified that he asked his brother whether he had signed a non-disclosure agreement with Crumbl and his brother answered "no." Dkt. No. 135-2 at 464:1–18. But Bennett Maxwell does not dispute that he "reviewed" the information to see what it was. Dkt. No. 100-1, 3 ¶ 7. And the notion that any ethical or prudent businessperson would have sanguinely accepted Bradley Maxwell's representation and ignored the obvious crimson flags upon being provided a direct competitor's recipes, sales statistics, "build-out" plans, and blueprints for franchise stores beggars belief. Further, Bennett Maxwell's evasive and misleading answer when directly asked on social media whether Dirty Dough had these materials leaves no doubt that he recognized their sensitivity and the dubious appearances raised by Dirty Dough's possession of them.

Finally, there can be no dispute that Dirty Dough *acquired* the Crumbl information when Bradley Maxwell uploaded it to Dirty Dough's Google Drive and directly shared it with Dirty Dough employees. And there is no real dispute that the Crumbl information was shared within Dirty Dough and meetings were held to discuss the information. *See* Dkt. No. 135-2 at 412:13–413:10. These facts, when considered together with the other evidence in this case, support a reasonable inference that—at a minimum—Dirty Dough referred to the Crumbl information as a resource in developing its own business processes, regardless of whether Dirty Dough actually copied Crumbl's recipes or processes. It is thus clear enough that Bennett Maxwell and Dirty Dough *disclosed* and *used* the Crumbl information without express or implied authorization—at least to this limited extent.

Although the court ultimately does not decide this issue, it thus concludes that Crumbl has probably established a substantial likelihood of success on the merits.

**B.**

Establishing a substantial likelihood of success on the merits is not enough to obtain the extraordinary remedy of a preliminary injunction, however. The moving party must also show that it "will suffer irreparable injury if the injunction is denied." *First W. Cap. Mgmt. Co.*, *v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017) (cleaned up). "To constitute irreparable harm, an injury must be certain, great, actual and not theoretical." *Schrier v. University of Colorado*, 427 F.3d 1253, 1267 (10th Cir. 2005) (cleaned up). The burden of showing irreparable harm is not "an easy burden to fulfill." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1262 (10th Cir. 2004) (cleaned up). Even if a movant demonstrates irreparable harm, moreover, "[i]t is well settled that an injunction must be narrowly tailored to remedy the harm shown." *ClearOne Commc'ns, Inc. v. Bowers*, 643 F.3d 735, 752 (10th Cir. 2011) (cleaned up).

Crumbl argues that the court may presume irreparable injury in this case based on the misappropriation of its trade secrets. But it is now well settled that federal "[c]ourts may presume irreparable harm only when a party is seeking an injunction under a statute that mandates injunctive relief as a remedy for a violation of the statute." *First W. Cap. Mgmt. Co.*, 874 F.3d at 1140 (citing *Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016)); *see also Trial Laws. Coll. v. Gerry Spence Trial Laws. Coll. at Thunderhead Ranch*, 23 F.4th 1262, 1270 (10th Cir. 2022) (citing *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 393–94 (2006)).

Neither the Defend Trade Secrets Act nor the Utah Uniform Trade Secrets Act mandates injunctive relief. Instead, these statutes provide that a court "*may* grant an injunction" or "*may* [] enjoin" misappropriation, respectively. 18 U.S.C. § 1836(b)(3)(A) (cleaned up; emphasis added); Utah Code 13-24-3(1) (emphasis added); *see also* Utah Code 13-24-3(3) ("In appropriate

15

circumstances, affirmative acts to protect a trade secret may be compelled by court order."). It follows that this court may not presume irreparable harm here.

There is no real dispute, however, that Dirty Dough's highest-ranking officers and employees possessed, circulated among themselves, and discussed highly sensitive Crumbl information during the summer and fall of 2021. And again, this activity, considered together with the other evidence in this case, supports a reasonable inference that—at a minimum—Dirty Dough referred to the Crumbl information as a resource in developing its own business processes, regardless of whether Dirty Dough actually copied Crumbl's recipes or processes.

Especially given the very real risk that Dirty Dough could have further used or disclosed the Crumbl information at any time or in any way, Crumbl's evidence that Dirty Dough possessed, circulated, and discussed its proprietary and confidential information may well have constituted a showing of irreparable injury sufficient to support a preliminary injunction requiring Dirty Dough's return of the Crumbl information and its deletion or return of any materials incorporating or derived from that information. For as the Supreme Court has explained, "[a]n allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation omitted).

And given that Dirty Dough had already used the Crumbl information—at least to the extent of circulating it, discussing it, and using it as a resource—the court need not rely on a presumption of irreparable injury to recognize that Crumbl had already suffered some degree of irreparable injury and faced a real risk of further irreparable injury so long as Dirty Dough continued to possess the information. For as the Tenth Circuit has recognized, even when a "rebuttable presumption" of irreparable injury is unavailable, the "underlying logic" on which

16

such a presumption would rest can still "bear on the existence of irreparable injury." *Trial Laws. Coll.*, 23 F.4th at 1271.

Dirty Dough no longer possesses the Crumble information, however. Rather, the parties stipulated to an order requiring Dirty Dough and Bradley Maxwell to return to Crumbl all copies or derivatives of the Crumbl information; to deliver to Crumbl any notes, memoranda, summaries, or compilations that contain information derived from or incorporating the Crumbl information; and to verify under oath that they have returned and delivered all of this information and not retained any of it in any form or format. And the purpose of a preliminary injunction is "not to remedy past harm." *Schrier*, 427 F.3d at 1267.

Further, although the evidence does support a reasonable inference that Dirty Dough used Crumbl's information as a resource and reference point in developing its own processes, the court concludes that the evidence that Crumbl has presented so far is insufficient to enable the court to determine the extent or significance of such use. Certainly Crumbl has not demonstrated that Dirty Dough copied or incorporated the Crumbl information into its recipes, processes, or business model. To the contrary, as already discussed, the evidence shows that Dirty Dough's recipes, processes, and business model all differ substantially from Crumbl's. Nor does the evidence submitted so far prove that the Crumbl information was indispensable—or even particularly helpful—to Dirty Dough. To be sure, Crumbl argues that Dirty Dough's extraordinarily rapid growth can only be attributed to its use of Crumbl's information. But even if Crumbl's explanation for Dirty Dough's rapid success is *possible*, Crumbl has not demonstrated that it is *probable*, or even *likely*.

Under these circumstances, the court concludes that even if Crumbl continues to face some degree of continuing or threatened irreparable injury despite the relief it has obtained

through the stipulated order, the further relief that it seeks is not "narrowly tailored to remedy the harm shown." *ClearOne Commc'ns*, 643 F.3d at 752 (cleaned up). Certainly its request for a moratorium on the opening of any new Dirty Dough franchise stores until the court has determined "that Dirty Dough will not use any Crumbl information to support franchisee stores" is vastly disproportionate to any lingering or threatened injury that can reasonably be inferred from the evidence presented so far. And Crumbl's request for a "corrective public statement conceding improper acquisition" of its information is not directed to that injury at all. Rather, it appears to be intended to redress an entirely different injury—the presumably embarrassing and perhaps undeserved fallout that Crumbl has suffered in the court of public opinion as a result of the advertising and public relations campaign Dirty Dough launched in response to this action.

## C.

A party seeking a preliminary junction must also demonstrate that "the threatened injury outweighs the harms that the preliminary injunction may cause the opposing party." *Aposhian*, 958 F.3d at 978. The court concludes that Crumbl has failed to make this showing. To the contrary, the evidence leaves little room for doubt that the further relief sought by Crumbl would cause harm to Dirty Dough and Bennett Maxwell that far outweighs whatever lingering or threatened injury Crumbl may now face.

As for Crumbl's request for an interim order barring Dirty Dough from opening any more franchise stores, the court credits Bennett Maxwell's testimony that without income from opening new franchise stores, Dirty Dough will "go out of business." Dkt. No. 135-2 at 441:8–442:23. Crumbl has not come close to showing that it still faces irreparable injury that could justify an economic death sentence for its nascent rival.

And as for Crumbl's request for a corrective statement, the court recognizes that the carefully worded and sophistic denial issued by Bennett Maxwell when asked whether Dirty Dough had in its possession "Crumbl recipes, building schematics, processes, store-level statistics, cookie calendar, training videos, and other proprietary information" was deceptive and deliberately misleading if not outright falsehood. But even in the defamation context, where a plaintiff must prove not only that a challenged statement is false but also that it is defamatory, a compelled retraction or corrective statement would be an extraordinary remedy.[4]

The court concludes that Crumbl has failed to show lingering or impending irreparable injury that outweighs Bennett Maxwell's First Amendment interest against compelled speech. For just as the First Amendment protects "the individual's right to speak his own mind," it bars public authorities from "compel[ling] him to utter what is not in his mind." *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 634 (1943).

## D.

Finally, Crumbl must show that "the injunction, if issued, will not adversely affect the public interest." *Aposhian*, 958 F.3d at 978. The court concludes that Crumbl has failed to make

---

[4] *See* Dan B. Dobbs, 2 DOBBS LAW OF REMEDIES § 7.2(14) at 300-301 (2d ed. 1993) ("Many states have retraction statutes, but these statutes emphatically do not require the publisher to retract defamatory materials. Instead, they usually limit the publisher's liability *if* a retraction is published.") (footnote omitted); Dan B. Dobbs, *et al.*, LAW OF TORTS § 576 (2d ed. May 2023 update) (explaining that these statutes "do not require retraction and almost certainly could not constitutionally do so"); Rodney A. Smolla, 2 LAW OF DEFAMATION § 9:92 (2d ed. May 2023 update) (opining that "[t]he draconian remedy of compulsory retraction or right of reply is probably best kept a theory" and observing that "[a]t this time there is no statutory authorization for such a remedy in any state"); *CJS Injunction* § 279 (2023) ("[A] court has no authority to compel the publishing of a correction or retraction of a previously published [defamatory] matter."); *cf. Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241 (1974) (holding that a statutory right of reply as a remedy for defamation violated the First Amendment).

this showing and that at least two compelling public interests weigh strongly against the further relief Crumbl seeks.

First, the public has a strong interest in free competition in the economic marketplace— whether for gourmet cookies or for any other consumer product. Indeed, "[t]he heart of our national economic policy long has been faith in the value of competition." *National Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 695 (1978) (cleaned up). Our economic system is premised on the proposition that "ultimately competition will produce not only lower prices, but also better goods and services" *Id.* Regardless of Crumbl's motivations for bringing this action against a rapidly emerging direct competitor, its request that the court bar Dirty Dough from expanding in the market while this suit is resolved would be profoundly anti-competitive in effect. Indeed, Bennett Maxwell provided credible testimony that the requested moratorium would put Dirty Dough out of business.

Second, the public's interest in a free marketplace of ideas is even more fundamental. As the Supreme Court has explained, the First Amendment "presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all." *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964) (quoting *United States v. Associated Press*, F. Supp. 362, 372 (S.D.N.Y. 1943) (Learned Hand, J.)) Indeed, so urgent is the need "to assure to the freedoms of speech and press that 'breathing space' essential to their fruitful exercise" that the First Amendment even extends "a measure of strategic protection to defamatory falsehood." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974) (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)).

*    *    *

For the foregoing reasons, Crumbl's motion for preliminary injunction is **DENIED**.

**IT IS SO ORDERED**.

DATED this 11th day of August, 2023

_____
Howard C. Nielson, Jr.
United States District Judge